UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) |
| v. | ) <br> ) Docket no. 2:21-cr-00166-GZS |
| CARL LANGSTON, | ) <br> ) |
| Defendant. | ) <br> ) |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is Defendant Carl Langston's Motion to Suppress Evidence (ECF No. 39). On June 2, 2022, the Court held an in-person evidentiary hearing on this Motion. Having considered the evidence and arguments before it, the Court DENIES the Motion for the reasons stated herein.

**I.    FACTUAL FINDINGS**

On the night of Saturday, February 6, 2021, Portland's Old Port neighborhood, home to many bars and restaurants, was busy. Pandemic-related restrictions on the hours of operation for many Old Port establishments had recently been lifted. As a result, the Portland Police Department ("PPD") was on alert given the neighborhood's reputation as an area prone to calls relating to alcohol consumption and physical violence.

Shortly before midnight, the PPD received a 911 call from a then-anonymous tipster reporting a disturbance outside The Bar, a bar located at 8 Exchange Street in the Old Port. According to dispatch, the tipster stated that "a black male wearing a black hat with horns . . . [was] yelling and had punched a white male that had a beard. . . . [T]he male that was punched is

gone now but the black male was still outside yelling."[1] (Gov't Ex. 2, 00:00–00:25.) The tipster reportedly observed events from his apartment. (Gov't Ex. 6.)

PPD Officers Garrick Rogers[2] and Ryan Cannell were dispatched to the scene, arriving within a few minutes. (See id.; Gov't Ex. 1, 11:00–11:10.) Upon their arrival, the officers did not observe an active disturbance or anyone matching the description provided. They spoke to a security guard (or "bouncer") at The Bar, which appeared relatively crowded. It was not uncommon for the officers to rely on information provided by such guards, who are able to keep their eyes on customers throughout the night and note potential issues. The guard confirmed there had been an altercation but believed that a recurrence was unlikely unless the participants encountered each other again somewhere else that night. Officer Rogers credited the guard's account and, roughly at midnight, radioed dispatch that everything was calm at The Bar and there was no sign of a disturbance. (See Gov't Ex. 6; Gov't Ex. 2, 00:40–00:46.) Rogers and Cannell then departed the scene.

Soon after the officers cleared the call, the same tipster called 911 again, this time identifying himself as "Shawn" and providing his phone number and an apartment address of 11 Exchange Street.[3] (See Gov't Ex. 6.) At this point, Shawn stated that the man "that started the fight" was "still in the bar." (See id.)

---

[1] The "horns" on this hat were part of an embroidered design.

[2] Since his graduation from the Maine Criminal Justice Academy, Rogers has received crisis intervention training, verbal crisis training, medical training, and training on the laws of Maine, and also completed a Safe Streets course. At the time of the events described herein, Officer Rogers had been with the PPD for just over a year.

[3] This call was not conveyed over the radio by dispatch but appeared in the complete call log, which was accessible to the officers in their cruisers' onboard displays. Compare Gov't Ex. 2 (recording), with Gov't Ex. 6 (call log).

Minutes later, the PPD received a 911 call from The Bar's manager, who was not on-site, conveying a report he had received from his on-site security guard.[4] Based on this "thirdhand" report, dispatch relayed the following information over the radio:

> One of the males involved in the fight went to his car and grabbed a 1032 gun. He's now looking for another male that he was fighting with. They said he had a pistol in his coat. Black male, 5′10″, maroon jacket with a grey hood. He's currently outside the bar with his hand in his pocket.

(Gov't Ex. 2, 01:50–02:10 & 02:28–02:34; see also Gov't Ex. 6.) Dispatch also relayed a report of a large group of people in the area. (Gov't Ex. 2, 02:32–02:34.) Rogers and Cannell were again dispatched to the scene, along with PPD Officer Zachary Theriault.[5] (See id., 02:20–02:22.)

Within several minutes of the receipt of the manager's call, the officers began to arrive outside The Bar. (See Gov't Ex. 1, 17:23–17:53; Gov't Ex. 6.) Officer Rogers parked his vehicle and approached The Bar from the corner of Fore Street and Exchange Street. (Gov't Ex. 3, 01:30.) He saw an individual matching the description that had been provided via the relayed 911 calls: Black, 5′10″, wearing a hat with an embroidered horn design, and dressed in a maroon jacket over a grey hoodie. This individual, who was later identified as Carl Langston, appeared to be arguing with another individual in a light grey jacket outside The Bar.

The man in the light grey jacket, who was later identified as Colton Carr, appeared to be blocking Langston's path into The Bar and had his hand on Langston, who in turn began pushing against him and toward the entrance.[6] (Gov't Ex. 3, 01:47–01:52.) At this point, Langston's hands

---

[4] The record remains unclear as to the source of the information relayed by the guard.

[5] Officer Theriault began his employment with the PPD in 2014. His duties include field training and firearms instruction, and he is a member of the special reaction team. For the last six and a half years, Theriault has worked the late-hour shift in the Old Port, often responding to calls involving disorderly conduct, fighting, public intoxication, and obstruction of traffic.

[6] Carr testified at the hearing that Langston was in fact his friend, and he was actually trying to convince Langston, who wished to go home, to reenter The Bar with him.

were not in his pockets. (Id.) As he approached, Rogers called out to Langston, "Put your hands on your head." (Id., 01:52–01:54.) Langston turned toward Rogers. (Id., 01:53.) The officer modeled what he wished Langston to do, placing his hands on his own head. (Gov't Ex. 4, 01:20–01:23.) Langston replied, "Who?" (Gov't Ex. 3, 01:54.)

Rogers repeated his command. Retreating slightly from the officer, Langston replied, "Nah." (Id., 01:55.) At this point, Langston was holding his right arm close against his body across his right jacket pocket, where Rogers suspected a gun was located based on the report from dispatch. Rogers believed Langston was attempting to keep the gun from moving around or being visible to the officer. Rogers repeated his commands at least twice more, and Langston continued to refuse.[7] (Id., 01:55–01:57.)

While Langston was refusing to follow Rogers's directions, Officer Theriault approached The Bar from the opposite direction, having parked his cruiser near the intersection of Milk Street and Exchange Street. (Gov't Ex. 4, 01:01–01:23.) Theriault, too, found Langston to match the description provided by dispatch. He perceived Langston as agitated and thought that Carr was trying to calm him down or keep him out of The Bar. As he approached, Theriault perceived Langston as refusing to comply with Rogers's commands. Because he was approaching from behind, Theriault could not see Langston's hands, so he believed Langston's hands were in his jacket pockets. Based on the prior information that the individual in question was armed, Theriault was concerned that Langston might pull a weapon from his pocket.

At this point, Langston backpedaled such that he was within arms-reach of Theriault. As Langston turned around and discovered a second officer on the scene, Theriault immediately grabbed Langston's right wrist and shoulder in order to deny him the opportunity to reach for a

---

[7] The Court notes that, when video of the stop was played during the hearing, Officer Rogers indicated that Langston said "no" in response to the officer's command.

4

weapon. (Gov't Ex. 4, 01:24.) Langston attempted to break the officer's hold and pull away. (Gov't Ex. 3, 01:58–01:59.) As this happened, Rogers also grabbed onto Langston, who continued to struggle. (Id.) Theriault then deliberately dropped to the ground, pulling Langston down on top of him. As the three men continued to struggle on the ground, the officers believed that Langston was attempting to bring his hands to the front of his body, toward where they believed a gun was potentially located. (See Gov't Ex. 1, 18:03–19:05; Gov't Ex. 3, 02:00–03:00; Gov't Ex. 4, 02:05–02:30.) They endeavored to keep Langston's hands behind him.

During this time, Officer Cannell arrived on the scene and began assisting his colleagues in subduing Langston. (Gov't Ex. 5, 03:39–03:52.) At various points during the struggle, the officers directed Langston to stop resisting, to put his hands behind his back, and to get on his stomach. (Gov't Ex. 3, 02:00–03:00.) He did not comply with these commands. (Id.) After about a minute, the officers gained control of Langston's person and Officer Rogers handcuffed him. (Id., 03:00–03:05.) During the struggle, Officer Theriault sustained an abrasion on his knee.

At this point, Theriault, still partially entangled with Langston, noted the grip of a pistol in plain view in Langston's right pocket. Officer Rogers also saw the weapon. The officers secured the pistol and proceeded to search Langston's person for other weapons. (Gov't Ex. 3, 03:56–04:00; Gov't Ex. 5, 05:50–06:50.) Langston, now in handcuffs, was then walked to Theriault's cruiser.[8] (Gov't Ex. 4, 04:51–05:16.) After adjusting Langston's handcuffs in response to his complaints that they were too tight, Theriault conducted a more thorough search of Langston's person, which yielded an additional loaded magazine.

---

[8] During this time Langston repeatedly asked Officer Theriault, "What was the probable cause?" In response, Officer Theriault told him, "You don't need probable cause to come talk to you. You are a citizen in a public place." Gov't Ex. 4, 04:53–04:58.

5

Langston was arrested for Refusing to Submit to Arrest or Detention, in violation of 17-A M.R.S.A. § 751-B.  (See Def. Ex. 4.)  Although he refused to identify himself to the responding officers, Langston was later identified by jail staff.  (See id., Bates No. 00000035.)

## II. DISCUSSION

In October 2021, a federal grand jury charged Defendant with one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), based on his possession of a .45 caliber pistol on or about February 7, 2021.  (Indictment (ECF No. 28), PageID # 51.)  As noted in the Indictment, prior to that date, Defendant had been convicted of two Maine felonies:  drug trafficking and theft.  (Id.)

Defendant subsequently filed the present Motion to suppress all evidence obtained or derived from the just-described police encounter.  Defendant advances two main grounds for suppression.  First, he argues that the officers lacked reasonable suspicion to perform an investigatory stop and weapons frisk under Terry v. Ohio, 392 U.S. 1 (1968).  (Def. Mot. (ECF No. 39), PageID #s 71–73.)  Second, he asserts that even if the police initially had reasonable suspicion to initiate the Terry stop, it evolved into a de facto arrest for which probable cause was lacking.  (Id., PageID #s 73–74.).  The Court considers each of these arguments in turn.

### A. Terry Stop & Frisk

The Fourth Amendment "does not pretermit all searches and seizures, but only those that are unreasonable."  United States v. Rasberry, 882 F.3d 241, 246 (1st Cir. 2018).  "Way back in 1968, the Supreme Court held in Terry v. Ohio that officers may briefly detain a person based on reasonable suspicion that he committed, is committing, or will soon commit a crime — 'even though there is no probable cause to make an arrest.'"  United States v. Guerrero, 19 F.4th 547, 554 (1st Cir. 2021) (quoting Terry, 392 U.S. at 22).  In addition to allowing a brief detention, Terry held that officers "may also frisk the person for weapons if they have reasonable suspicion that he

is 'armed and presently dangerous.'" Id. (quoting Terry, 392 U.S. at 30). However, "[t]he sole purpose of [a Terry frisk] is . . . to allow the officer to pursue his investigation without fear of violence." Id. (internal quotation marks omitted).

Generally, the constitutionality of a Terry stop and its accompanying frisk will be reviewed separately, although "[s]ometimes . . . the reasonable suspicion of a crime that justifies a stop will also justify a frisk because the very nature of the crime poses a sufficient risk that the stopped individual is armed and dangerous." United States v. Belin, 868 F.3d 43, 49 (1st Cir. 2017). As to a Terry stop, each stop "must be justified at its inception," and "[t]hen, as the stop proceeds, the officers' actions must be 'reasonably related in scope to the circumstances which justified the interference.'" Rasberry, 882 F.3d at 247 (quoting United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998)). "[I]f a stop begins as a Terry stop but becomes too intrusive, it will morph into a de facto arrest." Id. As to a Terry frisk, the dispositive question is "'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" Guerrero, 19 F.4th at 554 (quoting Terry, 392 U.S. at 27).

### 1. The Inception of the Stop

Before proceeding further, the Court must determine when this stop began for Fourth Amendment purposes. The answer to this question delimits what information can be attributed to the investigating officers for the purpose of establishing reasonable suspicion.

There are two main ways a Terry stop can start. First, the application of physical force with the intent to restrain constitutes a Fourth Amendment seizure regardless of whether the detainee submits to that force. See Torres v. Madrid, 141 S. Ct. 989, 1003 (2021). Second, "a stop instead may occur merely upon law enforcement making what the Supreme Court has termed a 'show of authority.'" United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016) (citing United

7

States v. Mendenhall, 446 U.S. 544, 553–54 (1980)).  However, a "show of authority effects a seizure only when the defendant actually yields or submits to the show of authority." Id.

Here, if Langston had complied with Officer Rogers's commands to put his hands on his head, this may well have constituted a sufficient show of authority to begin the stop for Fourth Amendment purposes.  However, because Langston did not comply with Rogers's instructions, the Court deems the stop to have initiated when Officer Theriault first grabbed his wrist and shoulder.

### 2. Was the Terry Stop Supported by Reasonable Suspicion?

"Reasonable suspicion requires there be both a particularized and an objective basis for suspecting the individual stopped of criminal activity." United States v. Dapolito, 713 F.3d 141, 148 (1st Cir. 2013).  "The particularity requirement demands that the finding be 'grounded in specific and articulable facts.'" Id. (quoting United States v. Hensley, 469 U.S. 221, 229 (1985)).  "The objective requirement dictates that [the Court] view the circumstances through the lens of a reasonable police officer." Id.  "The reasonable suspicion standard 'defies precise definition,' and 'must be determined case by case.'" Id. (quoting United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001)).  The standard "is based on the totality of the circumstances" and "entails a measurable degree of deference to the perceptions of experienced law enforcement officers." United States v. Cruz-Rivera, 14 F.4th 32, 43–44 (1st Cir. 2021) (quoting United States v. Ruidíaz, 529 F.3d 25, 29 (1st Cir. 2008)).

Here, at the outset of the Terry stop, the responding officers had the following information at their disposal:  (1) the various accounts received from the three informants; (2) their own observations of Defendant's appearance and behavior immediately preceding the stop; and (3) their law enforcement training and experience, which included their experience policing the Old Port.

8

### a. The Informants' Accounts

The Court turns first to the accounts received from the neighbor, the security guard, and the manager of The Bar. "Information provided to police by third parties may create reasonable suspicion if the information contains sufficient 'indicia of reliability.'" United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012) (quoting Alabama v. White, 496 U.S. 325, 328 (1990)). "The reliability inquiry—like the reasonable suspicion inquiry itself—must be made in light of the totality of the circumstances." United States v. Brown, 500 F.3d 48, 54 (1st Cir. 2007); see also United States v. White, 804 F.3d 132, 137 (1st Cir. 2015) (non-exhaustive list of factors for assessing reliability). Importantly, for purposes of conducting a Terry stop, "reasonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." Florida v. J.L., 529 U.S. 266, 272 (2000).

As to the neighbor, Shawn, while this individual may have been initially reluctant to reveal his identity, by the time of the stop, he had disclosed his name, phone number, and address. Knowledge of a "tipster's name, phone number, and address . . . matters . . . because it . . . ups the chance that [law enforcement] can come down hard on the tipster if the tip is false, and that threat ups the chance that the tip is reliable." United States v. Sanchez, 817 F.3d 38, 43 (1st Cir. 2016). It is also clear on the present record that this informant made his observations firsthand and made his reports either contemporaneously with, or soon after, the events he witnessed. See Navarette v. California, 572 U.S. 393, 399–400 (2014) ("In evidence law, we generally credit the proposition that statements about an event and made soon after perceiving that event are especially trustworthy because substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." (internal quotation marks omitted)). Furthermore, in his first call, he reported that the individual in question had punched another man—a violent, criminal act. See id. (finding sufficiently reliable anonymous tip suggesting informant had eyewitness knowledge

9

of dangerous driving and reported the incident soon after it occurred). It is true that Defendant's absence from the scene during the officer's initial visit did not align with this informant's assertion some minutes earlier that the man was "still outside yelling." (Gov't Ex. 6); see also United States v. Monteiro, 447 F.3d 39, 46 (1st Cir. 2006) ("When an initial police investigation into a tip of illegal activity reveals factors inconsistent with the tip, the reasonable suspicion analysis must take these indicia of unreliability into account along with any indicia of reliability."). However, the neighbor's account was largely borne out on the officers' second visit, when they encountered a black man wearing a hat with an embroidered horn design who appeared agitated and engaged in what appeared to be an argument outside The Bar.

As to the information obtained directly from the security guard, the guard does not appear to have provided an in-depth description of the combatants. However, his account, obtained firsthand by the officers investigating the initial 911 call, ultimately corroborated both of the other accounts. First, the guard acknowledged that there had been an altercation only minutes prior, as reported by the neighbor. Second, the account also predicted that there could be a recurrence if the two individuals met again, lending credibility and urgency to the manager's later call reporting that the individual had returned with a weapon in search of the man he had previously punched.

As to the thirdhand account obtained from The Bar's manager, it lacks some indicia of reliability when viewed in isolation. To this day, the originator of the information conveyed by the guard to the manager remains unknown and, as a result, the police were unable to gauge the reliability of this individual directly. See Monteiro, 447 F.3d at 45–48 (finding a "hearsay tip" alone could not provide reasonable suspicion). On the other hand, the account was detailed and largely predicted what the responding officers found. The manager's account was also corroborated by the other informants, as all three imputed violent behavior to a single individual

within a short window of time. Furthermore, the tip suggested an ongoing and imminent threat to public safety, which may be accorded special weight. See id. at 49 (acknowledging "there may be a rationale for according special weight to anonymous tips in cases of an imminent threat to public safety" (citing J.L., 529 U.S. at 273–74)); see also Ruidíaz, 529 F.3d at 31 n.2 (relevant to reliability inquiry that tip "referenced an ongoing emergency," as "reports about ongoing emergencies, by virtue of their very nature, necessitate quick action"). In sum, the manager's call is relevant to the evaluation of the totality of the circumstances, even if it may have been insufficiently reliable to support reasonable suspicion by itself. [9]

Defendant suggests that reasonable suspicion is lacking because Rogers and Theriault did not stop to further investigate the credibility of the manager's account. (See Def. Reply, PageID # 100.) It is true that "Terry stops may become . . . less reasonable if the police have had the time to develop better grounds for the stop but have failed to do so." Monteiro, 447 F.3d at 49 (internal quotation marks omitted). However, this is not such a case. First, as discussed, the manager's account was not the only information at the officers' disposal at the time of the stop. Second, this was not a case where the officers "had the time." Id. Importantly, the manager's account suggested a potentially imminent crime, which officers could still step in to prevent, as opposed an already completed one for which haste would be less urgent. See Hensley, 469 U.S. at 228 (noting "factors in the balance may be somewhat different" when "a stop to investigate ongoing criminal conduct" is involved rather than "a stop to investigate past criminal activity").

---

[9] During the hearing, Defendant focused in significant part on the shortcomings of the manager's tip when viewed in isolation. However, a report's mutual corroboration by multiple independent sources is a highly material indicator of reliability. See United States v. Vandergroen, 964 F.3d 876, 880 (9th Cir. 2020) ("The existence of multiple tipsters, though anonymous, mitigates the specter of 'an unknown, unaccountable informant . . . seeking to harass another [by] set[ting] in motion an intrusive, embarrassing police search' by relaying false information." (alterations in original) (quoting J.L., 529 U.S. at 271–72)). Here, the reports obtained from these three informants were not contradictory but, rather, mutually corroborative where they overlapped.

### b. The Officers' Observations & Experience

Beyond the three corroborating accounts, the Court's analysis of the totality of the circumstances must also consider the officers' observations upon their arrival at the scene. First, Defendant's appearance matched the descriptions provided by both the neighbor and the manager, further corroborating both informants' accounts. See Jones, 700 F.3d at 622 ("Corroboration of apparently innocent activity can establish the reliability of the informant because the activity might come to appear suspicious in light of the initial tip." (quoting United States v. Greenburg, 410 F.3d 63, 69 (1st Cir. 2005)). Additionally, having viewed all of the footage entered into evidence in this case, the Court agrees that a reasonable officer would have found that Langston appeared to be agitated and in a dispute with an individual who seemed to be preventing him from entering a crowded bar.[10] The video evidence also shows that Langston's right arm was held in a position that would align with the presence of a weapon, further corroborating the manager's account that Langston possessed a weapon.[11] While reasonable suspicion must be based on "more than just nervousness and furtive movements in questionable surroundings," the information is nonetheless part of the totality of the circumstances. United States v. Awer, 770 F.3d 83, 91 (1st Cir. 2014); see also id. at 91–92 (finding no basis for clear error in district court's finding that various movements were "suspicious"). Furthermore, from Theriault's perspective it appeared that Langston's hands were actually *in* his pockets, corroborating that part of the manager's call as well.

---

[10] The Court acknowledges Carr's testimony that this encounter may have been friendlier than it appeared, but the officers did not have this context and the Court finds their impression of the scene they observed to have been objectively reasonable.

[11] Although possession of a firearm can be innocent, the corroboration of this part of the call nonetheless adds credibility to the manager's other assertions. See Jones, 700 F.3d at 622; cf. United States v. Centeno-González, 989 F.3d 36, 46 (1st Cir. 2021) (in reviewing a warrantless arrest, finding officers' observation of "entirely innocent" conduct "enough to corroborate the information provided by . . . two callers").

Also, Langston repeatedly refused to cooperate with Rogers's commands to place his hands on his head. "[A] refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Florida v. Bostick, 501 U.S. 429, 437 (1991) (citations omitted). Here, however, Langston's refusal was far from the only factor present and it undeniably and reasonably increased the level of suspicion, particularly given the officers' experience with the Old Port and the people frequenting its establishments on a weekend night. See United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005) ("[P]olice are permitted to take the character of a neighborhood into account when assessing whether a stop is appropriate," albeit "it is only one factor that must be looked at alongside all the other circumstances when assessing the reasonableness of the officers' fear for their safety.").

### c. Conclusion on Reasonable Suspicion at Outset of Terry Stop

Reviewing the totality of the circumstances, the Court concludes that the stop was supported at the outset by reasonable suspicion. The officers had reasonable suspicion to believe that Langston had committed a crime and was poised to commit another. Specifically, the Court finds that the officers had reasonable suspicion that Langston had punched another individual earlier in the night and was poised to menace this same individual with a firearm within the close confines of a crowded bar.

### 3. Was the Terry Frisk Supported by Reasonable Suspicion?

As to the Terry frisk, "[w]hen an officer has a reasonable suspicion that a crime of violence has occurred, the same information that will support an investigatory stop will *without more* support a frisk." United States v. Mouscardy, 722 F.3d 68, 75 (1st Cir. 2013) (internal quotation marks omitted) (emphasis in original). As just noted, the officers here had reasonable suspicion to believe that Langston had assaulted another individual shortly before they encountered him outside The Bar. The Court's analysis could therefore very well end here.

13

Nonetheless, the Court alternatively concludes that the combination of the informants' statements, the position of Langston's arm close to his pocket, his apparent agitation, his apparent attempt to enter The Bar, and his refusal to place his hands on his head independently provided the officers reasonable suspicion to believe that he was armed and posed a danger to the safety of both the officers themselves and the innocent bystanders in and around The Bar.  See id., at 75–76 (concluding that pat-frisk was justified in part by the "conduct and disposition" of individual who "became agitated and nervous" during stop); United States v. Dubose, 579 F.3d 117, 122 (1st Cir. 2009) (suspect's refusal to remove hand from pocket contributed to reasonable suspicion); United States v. Soares, 521 F.3d 117, 121 (1st Cir. 2008) (suspect's refusal of order to keep hands in view contributed to reasonable suspicion); see also Terry, 392 U.S. at 27 ("[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.").  This finding is further buttressed by the responding officers' experience and training, along with the reputation of the area.[12]  See United States v. Arvizu, 534 U.S. 266, 273 (2002) (Reasonable suspicion analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." (internal quotation marks omitted)).

---

[12] The Court further notes that the Terry frisk, unlike the broader investigatory stop, did not commence until after the minute-long struggle on the ground.  Accordingly, the officers could also look to Defendant's conduct during that struggle, including his noncompliance with their repeated commands.  See, e.g., United States v. Cardona-Vicente, 817 F.3d 823, 828 (1st Cir. 2016) (Although the "violation that justified the initial stop . . . would have been clearly insufficient to justify a pat-frisk, several factors became apparent as the . . . stop progressed which were sufficient to give rise to a reasonable suspicion that there was a gun in [defendant's possession]."); Soares, 521 F.3d at 120.

### 4. Evolution of the Terry Stop

The Court now turns to Defendant's argument that the officers' actions exceeded the bounds of a permissible Terry stop and engaged in a de facto arrest, which must be supported by probable cause, a higher standard than reasonable suspicion. (Def. Mot., PageID #s 73–74.)

The "dispositive question" for determining whether a Terry stop has morphed into a de facto arrest "is whether a reasonable person standing in the suspect's shoes would understand his position 'to be tantamount to being under arrest.'" Rasberry, 882 F.3d at 247 (quoting United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994)). That said, during a Terry stop officers are "allowed . . . to take measures that are reasonably calculated to protect themselves or others from harm," so long as "such prophylactic measures [are] proportionate to the perils associated with the particular circumstances." Id. "Security precautions, such as the use of handcuffs, must be based on the officers' 'reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.'" Id. at 247–48 (quoting Acosta-Colon, 157 F.3d at 19); see also United States v. Pontoo, 666 F.3d 20, 30–31 (1st Cir. 2011) (explaining that "prophylactic measures can be employed in combination").

Here, the steps the officers took were proportionate and responsive to the circumstances that emerged during the stop. First, the officers, already in receipt of three mutually corroborative informant accounts, discovered Langston in an agitated state and believed he was attempting to enter The Bar. When Langston then failed to place his hands on his head and submit to a verbal show of authority, the officers were justified in seeking to physically restrain him. When Langston reacted by pulling away and struggling with Officer Theriault, it was reasonable for the officers to take further steps to subdue him. When the officers came to believe Langston was actively attempting to access his front pocket, where they suspected he had a gun, it became reasonable to

pin his hands behind his back and handcuff him.  See, e.g., Rasberry, 882 F.3d at 248; United States v. Meadows, 571 F.3d 131, 141 (1st Cir. 2009) (distinguishing use of handcuffs in Acosta-Colon, where "no facts justified the handcuffing, since nothing indicated resistance or belligerence" and "there was no evidence that any of the . . . officers harbored an actual suspicion that [defendant] was armed") (internal quotation marks omitted)); United States v. Maguire, 359 F.3d 71, 77–79 (1st Cir. 2004) (concluding stop did not amount to a de facto arrest although the defendant, armed with a knife, had been "wrestled to the ground" by officers).

In the Court's view, the facts of this case do not rise to the level of a de facto arrest.

### B. Search Incident to Arrest

That said, the Government alternatively argues that even if the Terry stop here were unconstitutional, the officers were entitled to search Defendant's person under the search incident to arrest exception to the Fourth Amendment's warrant requirement.  (Gov't Response, PageID #s 91–93.)  Under this exception, officers carrying out a lawful arrest have the authority to make a warrantless search of the arrestee's person.  See, e.g., Birchfield v. North Dakota, 579 U.S. 438, 458–61 (2016) (discussing provenance of exception).  "The search incident to arrest warrant exception is premised on protecting officers and preventing evidence destruction[.]"  Alasaad v. Mayorkas, 988 F.3d 8, 17 (1st Cir. 2021).  Despite these narrow underpinnings, it has long since been established that "[t]he constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence.  The fact of a lawful arrest, standing alone, authorizes a search."  Maryland v. King, 569 U.S. 435, 449 (2013) (quoting Michigan v. DeFillippo, 443 U.S. 31, 35 (1979)).

The Court agrees with the Government.  Once Langston refused to comply with the officers' directions and then used physical force against them, they had probable cause to believe he had committed the crime of Refusing to Submit to Arrest or Detention, in violation of 17-A

M.R.S.A. § 751-B.[13] Accordingly, the officers had grounds to arrest him for that intervening crime and conduct a search incident to arrest.[14]

### III.     CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Evidence (ECF No. 39) is hereby DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 29th day of June, 2022.

---

[13] "A person is guilty of refusing to submit to arrest or detention if, with the intent to hinder, delay or prevent a law enforcement officer from effecting the arrest or detention of that person, the person . . . [r]efuses to stop on request or signal of a law enforcement officer . . . ; [u]ses physical force against the law enforcement officer . . . ." 17-A M.R.S.A. § 751-B(1)(A) & (B). Defendant's conduct implicated the just-quoted portions of the statute.

Insofar as Defendant argued during the hearing that his resistance was defensible, the Court finds no basis for this assertion. Putting aside all other issues, the argument fails on its own terms. Section 751-B contains two defenses, neither of which apply here. A more general defense is located in 17-A M.R.S.A. § 108(1-A). Under this defense, "[a] person is justified in using the degree of nondeadly force the person reasonably believes is necessary to defend the person . . . against a law enforcement officer who, in effecting an arrest or detention, uses nondeadly force not justified under section 107, subsection 1." However, the Court does not find any basis to conclude that Defendant reasonably believed he needed to defend himself. This was not suggested by the evidence before the Court, and Defendant freely chose not to testify. Accordingly, this defense, too, is precluded.

[14] To be clear, Defendant's commission of a new crime during the intervening period between the Terry stop and the search does not retroactively affect the constitutionality of the Terry stop. Rather, it implicates an exception to the exclusionary rule, the so-called "attenuation doctrine," under which "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance[.]" Utah v. Strieff, 579 U.S. 232, 238 (2016) (internal quotation marks omitted). The Court finds the facts here to resemble past examples of cases where the First Circuit has applied this exception. See United States v. King, 724 F.2d 253, 256 (1st Cir. 1984) (assuming illegality of initial police conduct but denying suppression of evidence against passenger when driver of car committed intervening act of shooting at officers and thereby provided probable cause to search); cf. United States v. Camacho, 661 F.3d 718, 722, 730–31 (1st Cir. 2011) (granting suppression of evidence where defendant's resistance of officers occurred *after* discovery of weapon during illegal frisk and was therefore not intervening act).